## DEL E. WEBB CONST. CO. v. NATIONAL LABOR RELATIONS BOARD.

## NATIONAL LABOR RELATIONS BOARD v. DEL E. WEBB CONST. CO. et al.

### Nos. 14428, 14446.

United States Court of Appeals, Eighth Circuit.

May 6, 1952.

Dominick L. Manoli, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Mark C. Curran, all of Washington, D. C., on the brief), for National Labor Relations Board.

Charles B. Blackmar, Kansas City, Mo. (Henry I. Eager, and Blackmar, Newkirk, Eager, Swanson & Midgley, all of Kansas City, Mo., on the brief), for Del E. Webb Const. Co.

John J. Manning, Kansas City, Mo. (Clif. Langsdale, Kansas City, Mo., on the brief), for respondent union.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The National Labor Relations Board found the Del E. Webb Construction Company and the International Hod Carriers', Building and Common Laborers' Union of America, Construction and General Laborers' Union No. 264, A. F. of L. (hereinafter called the Union) guilty of engaging in unfair labor practices, and issued an Order, directing each of the respondents to cease and desist from such unfair practices; ordering the respondents jointly to make certain individual complainants whole for loss of pay; ordering the Company to hire, or place on a preferential hiring list, the individual complainants not then working for the Company; and ordering the posting of appropriate notices.

In No. 14,428, the respondent Webb Construction Company seeks review of the order of the Board pursuant to § 10(f) of the Labor Management Relations Act, 1947, 61 Stat. 136,[1] 29 U.S.C.A. § 160(f). In No. 14,446, the Board petitions this Court, pursuant to § 10(e) of the Act, 29 U.S.C.A. § 160(e) for enforcement of its order. The Board resists the petition for review of the Company, and both the Company and the Union resist the Board's petition for enforcement in No. 14,446. The two cases were consolidated for hearing here. This Court has jurisdiction of the proceedings, the alleged unfair practices having occurred in Kansas City, Missouri, at the site of a hospital there being constructed by the Webb Company.

1. Hereinafter referred to as the Act.

The proceedings were begun by charges filed with the Labor Board by three individuals, John Words, Booker Armstrong, and James Ellis, all of whom were construction laborers in Kansas City, Missouri, and members of the respondent Union.

It was alleged in the charges filed before the Board that the respondent Company and the respondent Union were engaging in unfair labor practices in that the Company required a "work order" or "referral slip" from the Union before employing the individuals, and in that the Union refused to give the three men such a "work order" or "referral slip". Because of these practices, the complainants charged that they failed to obtain employment they otherwise would have received.

Based upon these charges, a complaint was filed against both the Company and the Union, and a hearing was had before a Trial Examiner, whose intermediate report was largely adopted by the Board. The Board's decision and order may be found in Decisions of N.L.R.B., Vol. 95, No. 17.

█ The Board found that the Company was engaged in interstate commerce within the meaning of the Act, and therefore was subject to its jurisdiction. This finding is undisputed. The great majority of the materials for the construction of the $8,000,-000 hospital, during which construction the labor practices here involved occurred, were shown to have been supplied, or to be in the process of being supplied, from interstate sources. In such cases the Board properly asserts its jurisdiction. National Labor Relations Board v. Denver Building & Trades Council, 341 U.S. 675, 71 S. Ct. 943, 95 L.Ed. 1284; National Labor Relations Board v. Ozark Dam Constructors, 8 Cir., 190 F.2d 222.

The Board then found the Company guilty of violating § 8(a) (1) and § 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (1) and § 158(a) (3), in that the Company had entered into an agreement or understanding with the Union to employ, as laborers at its Kansas City project, only union members referred to it by the respondent Union; and in that in furtherance of that agreement, the Company refused to employ three individuals, John Words, Booker Arm-strong, and James Ellis, because those individuals had not been referred to it by the Union. The Board found the Union guilty of violating § 8(b) (1) (A) and § 8(b) (2) of the Act, 29 U.S.C.A. § 158(b) (1) (A) and § 158(b) (2), in that it had entered into the same agreement with the Company, thus restraining or coercing employees in the exercise of their rights guaranteed by § 7 of the Act, 29 U.S.C.A. § 157; and in that the Union had caused, or attempted to cause, an employer to discriminate against certain individuals so as to encourage union membership.

There are two questions for review here: 1) is there substantial evidence in the record as a whole to support the finding of the Board that the Company and the Union, on November 15, 1949, entered into an agreement embodying unfair labor practices; and 2) did the Company, or the Union, or the two jointly, unfairly discriminate against the three individual charging parties, who allegedly sought employment and were wrongfully refused? In the view we take of the case, it is unnecessary for us to consider other objections raised by the Company as to the validity or appropriateness of the back-pay or re-instatement awards ordered by the Board.

█ It may further be stated that since, as set out below, we find that no illegal agreement was entered into and that no discrimination was practiced by the Company or the Union, we do not determine whether the Company could or could not be held to have committed an unfair labor practice by merely entering into a discriminatory hiring agreement. With regard to the Union, it is settled that the mere entering into an agreement which calls for an employer to discriminate against some employees in such a way as to encourage or discourage union membership constitutes an unfair labor practice for the Union. The Act so provides in § 8(b) (2), 29 U.S.C.A. § 158 (b) (2), where it states: "It shall be an unfair labor practice for a labor organization or its agents—* * * (2) to cause or *attempt to cause* an employer to discriminate against an employee in violation of subsection (a) (3) * * *." (Emphasis supplied.) See, National Labor Relations

Board v. National Maritime Union, 2 Cir., 175 F.2d 686, 689.

1. The alleged agreement of November 15, 1949.

The Del E. Webb Construction Company is engaged in the general contracting and construction business with its main offices in Phoenix, Arizona. The Company undertakes large construction jobs throughout the United States and in September of 1949 it began construction of a veterans' hospital in Kansas City, Missouri, under a contract with the United States Government. It was in connection with this Kansas City project that the labor practices here involved occurred.

The respondent Union is composed of individuals who offer themselves for semi-skilled and unskilled jobs in construction work in the Kansas City area—that is, the members are what are called "common laborers". Evidence adduced before the Trial Examiner showed that Kansas City had been a "closed-shop town" in construction work for more than 40 years prior to 1949. About 98% of the men employed as common laborers in construction work are union members. Prior to March 31, 1949, there was in effect a master agreement (entered into in 1946) embodying closed-shop provisions between the District Trades Council (composed of A. F. of L. craft unions in the construction industry) and the Builders' Association (an organization of various employer associations, including the National Association of which the Webb Construction Company was a member). Separate agreements had been negotiated with each of the various craft unions covering the conditions peculiar to each respective craft. These closed-shop provisions are forbidden by the present Labor Management Relations Act and expired on March 31, 1949. No further such formal agreements have since been entered into between management and labor organizations in the construction field in Kansas City, Missouri.

As stated above, preliminary work on the project was begun in September of 1949. On November 15, 1949, John Neil, a general superintendent for the Construction Company in charge of the hospital project, met with representatives of the District Trades Council. Among those representatives was Don Jarrett, an assistant business agent for the respondent Union. The meeting on November 15 was held at the trade hall in Kansas City, and was of an introductory, general nature, held, as was testified, for the purpose of establishing cordial relations between the employing Company and the representatives of the various trades whose members would man the project, and for the purpose of outlining in general the essential labor requirements of the Company, and the availability of labor to fill those needs.

At the hearing before the Trial Examiner, Mr. Neil was called by the Board as a witness, and Mr. Jarrett was called by the respondent Union. Neil testified by deposition and at the time he testified he was no longer associated with the Webb Company. Both men were questioned concerning this meeting of November 15, and both testified positively that there was no agreement or understanding reached at the meeting that Neil was to hire *only* union men as common laborers on the job. Both witnesses testified that there was discussion concerning the furnishing of laborers by the Union. In conformity with long established practice, it was agreed that if the Company would call the union hall, the Union would send out as many laborers as requested. It was also agreed that men sent out from the union hall would be furnished "referral slips" or "work orders" by the Union.

During the course of the meeting Neil accepted a copy of the Union's working rules. These rules in general provide for conditions on the job. Among other things, however, the working rules provided that a member of the Union should act as steward on every job, and that "all employees must, after being hired, report to the steward before starting to work". Neil testified that he accepted the copy of the rules as a matter of course, and that he didn't read them because "working rules are pretty much the same all over the country."

From the foregoing evidence, and from inferences drawn from later occurrences, hereinafter discussed, the Board concluded "that on November 15, 1949, the Respondents became parties to an oral agreement

or arangement whereby the Union undertook to supply Webb with all the common laborers it needed, and Webb agreed to employ only union members who had first received work orders from the Union".

It is admitted by both respondents that a "hiring-hall" arrangement was discussed and agreed upon at the November 15 meeting. It is the contention of both the Company and the Union that the hiring-hall arrangement entered into was a legal device, while the Board held the arrangement constituted an unfair labor practice within the purview of the Act. It was the view of the Board that the arrangement discriminated against two types of employees or potential employees: 1) nonunion men; and 2) union members who did not have a "work order" or "referral slip" from the union hall. For the purpose of discussion of the existence of an illegal agreement, it is necessary only to consider the position of non-union men, since if there was no discriminatory agreement as to them, any action of either respondent could hardly be said to encourage retention of union membership.

If the hiring-hall arrangement in this case were what the Union and Company representatives contend it was, then it is our view that it would not constitute an unfair labor practice. The factor in a hiring-hall arrangement which makes the device an unfair labor practice is the agreement to hire *only* union members referred to the employer. See, American Pipe and Steel Corporation, 93 N.L.R.B. 54. If, as is contended here by the Union and the employer, the practice agreed upon was that the union hall would send out laborers at the Company's request, and the Company retained its freedom and right to hire labor at the job-site and made no agreement to hire only union labor, then the arrangement would not constitute an unfair labor practice within the meaning of the Act. The Act makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment *to encourage or discourage membership* in any labor organization". (Emphasis supplied.) 29 U.S.C.A. § 158(a) (3). If an employer does not expressly agree to hire only union labor through the union hall, he cannot be said to be encouraging union membership by hiring through the hall since he retains his right to hire non-union labor at the job-site.

The evidence as a whole then, in order to show that the Company and the Union entered into an illegal hiring-hall agreement, must show that the Company agreed to hire, as common laborers, only union members. To see if the evidence sutains this finding we must examine the record as a whole, considering not only the evidence tending to support the finding but also the evidence militating against that finding. § 10(e) of the Act; 29 U.S.C.A. § 160(e). Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Consideration of the direct testimony of persons present at the meeting of November 15 and called as witnesses both by the Board and by the respondents discloses that the finding that an illegal agreement was entered into at that time finds no support therein. To the contrary, the testimony of such witnesses was unequivocally that no agreement to hire only union laborers was made. The Board, in the absence of any direct testimony, has resorted to a consideration of circumstances which it alleges support an inference that the Company bound itself to employ only union members from the union hall.

Among the circumstances relied on by the Board was the fact that Neil, Webb's general superintendent on the hospital project, accepted a copy of the Union's working rules embodying the provision set out above concerning all workers reporting to the union steward. Neil did not expressly agree to be bound by the union working rules, but the Board found that under the circumstances he impliedly assented to be bound. Neil testified that he did not even read the rules, although he admitted that as a man of considerable experience in the field he knew approximately what they contained. The phrase seized upon by the Board ("all employees must, after being hired, report to the steward before starting to work") cannot support an inference that the employer agreed to employ only

union members. Even assuming that Neil had agreed to observe the working rules, it does not follow that because all employees had to report to the steward that only union members would be hired. Assuming that the Union, by this practice and by other means, effectively policed the job, it does not follow that the Company had agreed to hire only union members. A contrary inference is just as strongly supported, since if the Union felt the necessity to police the project so thoroughly perhaps the Company had not agreed to hire only union men. There is no strong, convincing link between the fact, if it were established, and the conclusion drawn from it.

The Board found further evidence that an illegal agreement had been entered into from the fact that all of the 80 to 100 common laborers hired by Webb during the period in question were members of the Union. The probative value of that fact is small. There was undisputed evidence that in the Kansas City area 98% of all common laborers in construction work were members of the Union. It is extremely likely that all of the laborers on any large project in that vicinity would be union men. Added to that is the undisputed fact that in the record there is no single instance shown of a non-union man applying for a job, either at the site of the project or at the union hall. If a non-union man had applied and been refused, an entirely different situation would be presented. What would have happened in that case, or in case a non-union man had applied and been accepted by the Company, we do not know. Any answer to such questions would necessarily be purely speculative.

As further evidence of the existence of the alleged agreement of November 15, the Board points to a conversation early in December between Neil and Jarrett, the Union representative. That such a conversation took place is not disputed. As stated in a footnote to the Board's opinion: "In several instances union members who resided in outlying towns and communities and as to whom the Union had recognized an exception, were hired on the Webb project without a referral slip, but these men later reported to the union hall for clearance. It was Webb's hiring of such applicants without prior union clearance that occasioned Jarrett's visit to the job and his conversation with Neil early in December, in which Jarrett invoked a strict adherence to the referral card arrangement." Jarrett testified that he asked Neil to clear all men hired through the union hall. He testified that Neil refused to accede to the request. Neil did not testify with regard to the particular conversation. Herbert Brown, a carpenter foreman, overheard the conversation, and had a general idea what it was about. Brown did not hear Neil answer Jarrett's request, but Brown testified that there had been such a request, and that since Neil did not have any labor trouble on the job he must have acceded to the Union's request. From Brown's analysis of the conversation, and from the fact that from the date of the conversation until March 7, 1950, no union men were hired at the job site without having a referral slip, the Board finds support for its finding that the employer had agreed on November 15 to hire only union men.

It so happened that after March 7, 1950, several union men were hired at the job site without the referral slips. The Trial Examiner did not consider these instances in his considerations, referring to them as "unexplained exceptions".

It can readily be seen that the Board's conclusion that a November 15 agreement was entered into is based on inferences and suspicions drawn from remote circumstances, and is in conflict with the direct testimony on the point. As a further example, the Trial Examiner states in his opinion that, "Brown [the carpenter foreman] also testified that although Webb and the Union had not set down and entered into any agreement for the hiring of only union men, it was 'just understood that they would be'". That the Trial Examiner should call attention to such an insignificant statement is surprising, but it is more surprising that he evidently gave it some weight. The statement is not only hearsay, but is apparently hearsay founded on rumor.

"Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, * * *", 29 U.S.C.A. § 160(b), and we cannot affirm any Board finding which has so little foundation in fact as this one.

Having considered the record as a whole we can find no substantial evidence to support the finding of the Board that on November 15, 1949, the Webb Construction Company and the respondent Union entered into an agreement which was in violation of the Labor Management Relations Act. Direct testimony refutes the Board's finding. The evidence relied on to support the finding consists of suspicions, unfounded conclusions and surmises, and inferences. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660.

The finding of the Board that an illegal agreement was entered into must be, and is, set aside.

2. The claimed discriminatory practices against the individual complainants.

John Words, Booker Armstrong, and James Ellis were the complainants. All were men who worked as common laborers on construction projects and all were members in good standing of the Union. Words had been a union member from 1941 to the date here involved; Armstrong from 1945; and Ellis from 1916 to 1936, and then from 1942 on.

On December 12, 1949, the three men went to the union hall about 8 o'clock in the morning. On that day 13 laborers were referred to the Webb project on requests from the Company, but the three men were not referred. The Trial Examiner concluded, however, that the failure of the men to get work at this time was not the fault of the Company or the Union, since the referrals at that time were probably made before the men arrived at the union

hall. The hall opened at 7:30 a. m. and employers frequently telephoned in requests for laborers the night before. When the three men were not referred, they went out to the Webb project about noon. There they talked to one Richardson, a common laborer on the project. Richardson volunteered to help the three get work, and introduced them to Herbert Brown, a carpenter foreman. Richardson, of course, had no authority to hire men, and neither did Brown. Brown, however, did have authority to recommend the hiring of specific men when he felt he needed additional help.

Brown took their names and said he would see someone in authority. The matter slipped his mind until after the general superintendent had gone home for the day and he was unable to discuss the matter with the general labor foreman who had authority to hire. Brown then returned to the men who were still waiting at the project. At that time Brown told Richardson to give the men a "slip" to the union hall, and Richardson did so in the following note: "To: Jerry Irving [an assistant business agent for the Union] Jerry—these men have a job out here [sic], please give them a work order for 12–13–49 it is O.K. Thanks a lot. Francis Richardson." Shortly before 5:00 p. m. the men returned to the union hall with Richardson's note and presented it to an officer of the Union, who told them they would have to speak to the business agent in the morning.

The next morning, December 13, 1949, the men again returned to the union hall but did not speak to the business agent until fifteen minutes before eight o'clock. By that time the agent had filled a request for eight laborers at the Webb project, and told them he could not send them out until he obtained further requests. The business agent knew that Francis Richardson had no authority to request men. The men waited at the hall until noon, and then went home. The following day they filed the charges which are the basis of the Board's complaint in this case.

In the meantime, at the project on December 13, Brown who still had the men's names, did not get to talk to the superintendent who had authority to hire, until

evening. At that time he approached the superintendent and talked to him about the three men, saying he needed them. The exact conversation is not clear, but the view most adverse to the Company is that the superintendent told Brown to hold up on these men because the Company might be in trouble on them. The trouble referred to was not made clear—that is, whether trouble was expected with the N.L.R.B. or the Union. At any rate we find it immaterial.

We find that the men had not effectively applied for jobs with the respondent Company. They had never talked to anyone who could hire them, although they talked to Brown, whom the Board found had "authority to recommend" hiring. They had never been refused employment for any reason by anyone who had authority to hire them. By the time their desire to work at the Webb project was made known to anyone who could hire them, it was in the evening of December 13. No laborers were hired between early in the morning of the 13th and the 19th. The complainants were not at the union hall early enough to be sent out to the project on the 13th, and they never applied directly to anyone in authority for work, and they cannot be heard now to claim they were discriminated against.

We do not hold in this case that a practice of making all union laborers seek employment through their union halls is or is not an unfair labor practice. On the facts before us we could make no such holding and this Court will not rule in the abstract.

There is the further point that it is difficult to see how the Company's action may be said "to encourage * * * membership in any labor organization", as charged by the Board, and which must be found if there is to be a Section 8(a)(3) violation. The men were already members of the Union, and in the absence of a showing that only union men were to be hired (a fact not proved herein as shown in the discussion of Point 1), it is difficult to see how the men would be encouraged to retain membership (which might be held to be a phase of "encouraging membership") in the Union, which must have seemed to them to be keeping them from employment.

The decisive factor, however, is that the individual complainants did not seek employment from the Company, and the Company therefore could not discriminate against them.

If the Company did not discriminate against the complainants in violation of Section 8(a)(3), 29 U.S.C.A. § 158(a)(3), it follows that the Union did not violate Section 8(b)(2), 29 U.S.C.A. § 158(b)(2), since the Union did not so act as to cause the employer to discriminate.

The Company and the Union, respectively, were also charged with violations of Sections 8(a)(1) and 8(b)(1)(A) of the Act, 29 U.S.C.A. § 158(a)(1) and § 158(b)(1)(A), which sections in general provide that neither an employer nor a labor organization shall interfere with the right of employees to join or refrain from joining labor organizations. There was no evidence adduced directed solely to violations of these sections of the Act, but instead the Board found that from the conduct of the respondents (i. e., in entering into an illegal agreement and in actually discriminating against individuals) there was a derivative violation of Sections 8(a)(1) and 8(b)(1)(A). Since as set out above we do not find any illegal agreement was entered into, and we do not find that any discrimination was practiced, it follows that the conduct of the respondents, as set out in the record before us, could not support a finding of violation of Sections 8(a)(1) and 8(b)(1)(A).

Enforcement of the order of the Board is denied.