**NATIONAL LABOR RELATIONS BOARD**

v.

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL 10, I.L.W.U.**

**No. 13851.**

United States Court of Appeals
Ninth Circuit.

June 28, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Louis Schwartz, Nancy M. Sherman, Washington, D. C., David Karasick, San Francisco, Cal., for petitioner.

Gladstein, Andersen & Leonard, Lloyd E. McMurray, San Francisco, Cal., for respondent.

Before BONE, LEMMON and FEE, Circuit Judges.

BONE, Circuit Judge.

The collective bargaining agreement between the ILWU (herein "union") and the Pacific Maritime Association (herein "employers"), requires the employers to hire all gangs of longshoremen through a hiring hall. Generally, the membership of each gang of longshoremen remains fixed and constant; each gang works as a unit; and the members of each gang obtain employment through the hiring of the gang through the hiring hall.

In the winter of 1950, an individual by the name of True Knowledge was working as a temporary member of Gang 50, when he learned that there was a vacancy for a permanent position on that gang. He sought that position without success. A man named Richardson was the boss of that gang, and although True Knowledge was satisfactory to everyone else on that gang, he was denied a permanent position by Richardson solely because True Knowledge was not a member of the union. True Knowledge is one of the three non-union longshoremen working on the San Francisco waterfront who are registered with the Port Labor Relations Committee (which said Committee is a joint committee of the union and employers in general charge of hiring, grievances and employment.)

Membership in gangs is largely controlled by the gang boss, although he has to maintain morale and harmony within his gang, and therefore considers the feelings of the other gang members before he makes any addition to the gang. The gang, as such, is dispatched from the hiring hall.

The hiring hall is operated under the Port Labor Relations Committee, which in turn is controlled by both the union and employers under their collective bargaining agreement. Such discrimina-tion as occurred in this case was in gang membership, for although True Knowledge was not discriminated against in the hiring hall, and he did receive employment, he was not permitted to become a permanent member of Gang 50. And the person who effectuated this discrimination was the gang boss, Richardson.

The record in this case, including the Pacific Coast Longshore Agreements between union and employers, does not show any direct lines of administrative or organizational authority between the union and the gang boss, except that the Port Labor Relations Committee (an instrumentality of both the union and employers) was given power to select and remove gang bosses. Nowhere in the record is there any other indication of any formal authority or procedure whereby Richardson's discriminatory actions are attributable to the union.

Nevertheless there was discrimination in employment against True Knowledge of a substantial sort, for refusal of gang membership prevented him from secur-ing employment which would have been more steady and regular than that which he was able to obtain. The employers did not hire True Knowledge because of this discrimination. And the discrimination was based upon non-membership in the union.

Notwithstanding the lack of formal, or direct administrative or organizational authority from the union to Richardson to discriminate, the record supports the Trial Examiner's findings and conclusions that the union fostered, supported and encouraged this discrimination as a part of its policy to maintain for practical purposes (though not for legal purposes) a closed shop with respect to gang membership. The Intermediate Report of the Trial Examiner makes a fair summary of the evidence in the case, and concludes (inter alia) with the following:

"As I view the evidence, at that point the Union had two alternative courses of action, each unacceptable for a different reason: (1) it could

grant True Knowledge his clearance, —but that would end the Union's long established closed shop of the gangs on the waterfront, or (2) it could deny clearance to True Knowledge, but that would be a patent violation of the Act. The Union, therefore attempted to do neither, it chose a third course—to equivocate, to slough off responsibility, and thus continue the practice while it sought to escape its responsibility under the Act. I find that the answer of the union committee, that the gangs were the sole judges of the admission of members, to be a pretext or device by which the Union denied clearance to True Knowledge. The statement of the union representatives was, in fact, no answer to the request of True Knowledge, and that is what the Union, intended it to be. In accordance with its long established practice, True Knowledge was at that moment deprived of employment as a member of Richardson's gang because he was not a member of the Union. Unless the Union affirmatively gave him clearance, he would continue to be unemployed. Under those circumstances the Union chose to say that the members of the gang decided who would be new members. With the closed shop practice of the Union in effect, True Knowledge, absent affirmative clearance, was barred from employment in the gang. The union representatives knew that, and deliberately decided to allow that situation, which it favored, to continue, and thus the discrimination against True Knowledge was made effective and permanent.

"I find that the Union was under a duty to disavow this long established custom when True Knowledge asked for clearance. * * *"

After considering the entire record as a whole, we find that there was substantial evidence to support these Concluding Findings of the Trial Examiner. There was also support in the record for his finding that this discrimination on the part of the Union caused the Employers to discriminate. "Causation" is used herein as it was in N. L. R. B. v. International L. W. U., 9 Cir. 210 F.2d 581, 583, 584.

There is a rather close parallel between this case and N. L. R. B. v. International L. W. U., supra. The chief difference between the cases is that in that case the dispatchers were elected by the Unions, as contrasted with the gang bosses in this case, who are appointed by the Port Labor Relations Committee. In that case the dispatchers obeyed the Union's expression of views that two non-union longshoremen should not be sent out on jobs. The close parallel between that case and this appears clearly in this paragraph of that opinion 210 F.2d at page 584:

"The unions then argue that they are protected by the provisions of Section 8(c), in that the Local's instructions to the dispatchers were mere expressions of views, etc., which contained no threat of reprisal or force or promise of benefit. This contention ignores the implied threat which was present—if the dispatchers did not obey they were subject to union discipline; the Employers were bound to hire only through the hiring hall; and any attempt on their part to hire Stafford or Sorce outside of the hall would have resulted in union trouble. The inference that the instructions to the dispatchers caused the Employers to discriminate against Stafford and Sorce is a reasonable inference, and one within the power of the Board to draw."

In the quoted case, the line of authority between the union and the dispatchers was only slightly more clearly delineated, at least as to the election of dispatchers. In the instant case, formal lines of authority run from the gang boss to the Port Labor Relations Committee, but the same control, the same threat of union discipline were present. Such being the case, there is no substantial ground of distinction between that case and this.

The brief of the Union properly criticizes the analysis of the evidence and conclusion of the Board. We cannot agree that "by engaging in a hiring hall arrangement," or by entering into a collective bargaining contract the legality and propriety of which is unquestioned (at least so far as appears in this proceeding) that the Union violated the law. We believe that the analysis of the Trial Examiner, as set forth hereinbefore, is more in accord with the evidence, viewing the record as a whole. That evidence, and the report of the Trial Examiner, support the order of the Board. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Waterfront Employers of Washington, 9 Cir., 211 F.2d 946.

The Board's Order will be enforced.