270 F.2d 425
 NATIONAL LABOR RELATIONS BOARD, Appellant,
v.
MOUNTAIN PACIFIC CHAPTER OF THE ASSOCIATED GENERAL
CONTRACTORS, INC.; The Associated General Contractors of
America, Seattle Chapter, Inc.; Associated General
Contractors of America, Tacoma Chapter; International
Hodcarriers, Building and Common Laborers Union of America,
Local No. 242, AFL-CIO; and Western Washington District
Council of International Hodcarriers, Building and Common
Laborers Union of America, AFL-CIO, Respondents.
 No. 15966.
 United States Court of Appeals Ninth Circuit.
 Aug. 28, 1959.
 
 Jerome D. Fenton, Gen. Gounsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Duane B. Beeson, William J. Avrutis, Attys., N.L.R.B., Washington, D.C., for petitioner.
 
 
 1
 Louis Sherman, Cornelius Gray, William J. Brown, Washington, D.C., for Building & Construction Trades Dept., AFL-CIO, intervenor.
 
 
 2
 Elliott, Lee, Carney & Thomas, Seattle, Wash., for Mountain Pacific Chapter of Associated Gen. Contractors of America.
 
 
 3
 Lycette, Diamond & Sylvester, Lyle L. Iversen, Seattle, Wash., for Associated Gen. Contractors of America, Seattle Chapter, Inc., and Associated Gen. Contractors of America, Tacoma Chapter.
 
 
 4
 L. Presley Gill, Seattle, Wash., and Vincent Morreale, Washington, D.C., for Union respondents and petitioners.
 
 
 5
 Before FEE and JERTBERG, Circuit Judges, and YANKWICH, District Judge.
 
 
 6
 JAMES ALGER FEE, Circuit Judge.
 
 
 7
 Lewis, a colored hodcarrier, had almost twenty years' experience in servicing bricklayers and plasterers. He was dropped from union membership in 1949 by Building and Common Laborers Union of America, Local No. 242, AFL-CIO, for nonpayment of dues. Lewis applied for work at the hiring hall maintained by this Union and in effect embraced by a contract entered into between Mountaion Pacific Chapter, Seattle Chapter and Tacoma Chapter, Associated General Contractors of America and Western Washington District Council of International Hodcarriers, Building and Common Laborers of America, AFL-CIO, in behalf of Local 242 and other Unions and the employers and organizations of employers who are defendants here.
 
 
 8
 There was a well established policy of the Union, during the time these contracts were negotiated and afterward, that the dispatcher should do all in his 'power to procure employment for such brothers of the hiring hall (Union members) as may desire situations in preference to any and all nonunion men.'
 
 
 9
 After Lewis had been dropped for nonpayment of dues, both before and after the present renewal of the contract had been executed by the parties, he was consistently refused work at the hiring hall maintained by this Union.
 
 
 10
 With this history, after the present extension of the contract above referred to had been effectuated, Lewis applied for employment at the hiring hall consistently during March, April and May of 1956. He repeatedly sought and failed to secure dispatch on the ground that there was then a slack season for hodcarriers. Upon many such occasions, hodcarriers were dispatched from the hiring hall, some repeatedly.
 
 
 11
 Lewis, during this time, made consistent effort to be reinstated in the Union and offered to pay dues. Officers of Local 242 refused upon the ground that 'there weren't any jobs' and that the Union 'would not take on any new members.'
 
 
 12
 Lewis filed three charges with the National Labor Relations Board after these incidents. First, he charged the Local on May 11, 1956. This action followed immediately after Lewis had secured a job not through the hiring hall, but independently. One of the officials of the Local threatened to place a picket line around the job unless Lewis was discharged. Thereupon, he was fired.
 
 
 13
 After the filing of the documents, officials of the Local refused to dispatch him, in the attempt to get him to dismiss the complaints. Varying the tactics, upon several occasions he was dispatched to a job with the suggestion, express or implied, that he withdraw the charges. He was visited on a job by Union officials who insistently questioned him as to his attitude with regard to the withdrawal of these complaints.
 
 
 14
 After much of this course of conduct, Lewis filed a charge against the Chapters also on August 7, 1956. Thereafter, he secured work through the hiring hall with substantial regularity. However, the pressure to have the charges withdrawn was continued insistently by officials of the hiring hall and the Local. All attempts of Lewis to join the Local were frustrated, and all tenders of dues were refused.
 
 
 15
 The third charge was thereupon filed against the District Council on September 13, 1956. The Board consolidated the three charges, and General Counsel issued complaint based thereon on September 20, 1956. The trial examiner found the facts above recited, among others and held the Local had violated the Act.[1]
 
 
 16
 The Board held that the Chapters and the District Council had likewise violated the Act by discrimination against Lewis.[2] This holding was predicated upon the entry of the contract between these organizations whereby hiring provisions of that contract were illegally maintained in effect, and, since there were no clauses therein prohibitory of discrimination, the implementation of the unlawful contract in the rejection of the continuous applications of Lewis for imployment was an unfair labor practice.
 
 
 17
 Although the Board found certain facts relative to the relationship of the parties and the contract, the ultimate holding was one of law. It ruled the contract was illegal because of the exclusive hiring hall provision which is therein contained. We hold this position is erroneous.
 
 
 18
 So far as the position of the Unions is concerned, we do not agree with any of the criticisms of the findings of the trial examiner and the Board. For the purposes of disposition of the petition of the Boars for enforcement, we deal only with two questions presented by the Unions. These questions are: Is the hiring hall clause per se illegal? and next: Will any discriminatory implemention of a hiring hall provision without protective clauses be chargeable to the parties to the written contract?
 
 
 19
 It is clear enough that the treatment accorded Lewis was not broungt about by the express provisions of the contract. The hiring hall could have been operated legally without discrimination against anyone, and the terms of the contract would wtill have been fulfilled. The Board decides that the contract is illegal, not because of what it says, but on account of those things which it does not say and which the order of the Board requires to be interpolated.[3]
 
 
 20
 The defense of the Chapters consists of complete detachment and naivete. The cardinal points are five: (1) The Chapters are not employers. (2) They have nothing to do with the hire, discharge or employment of men under the contract, and the managers of the Chapters actually had no direct knowledge of what their members did with respect to the hiring of men. (3) The Chapters had consistently advised their members that, in the hiring of employees, they were not to discriminate with respect to employment. (4) The members had not employed any men through the hiring hall and, particularly, there was no discrimination against Lewis on any job controlled by a member. Finally, they contend that the Chapters did not advise their members to obtain employees exclusively through the hiring hall and the members frequently did hire men from other sources.
 
 
 21
 As to all these contentions except the first, there is a plain answer. Even if it be assumed that these positions are sustained by proof in the record, such proof would not compel a finding that the Chapters did not participate in an agreement to discriminate. The Board should, of course, consider such proof, if any, as that might be significant in the determination of whether there was or was not such an agreement.
 
 
 22
 Of course, no legal defense would be presented to a charge that the Chapters deliberately entered into a contract with the Unions in this form set out for the purpose of discriminating against Lewis or other persons similarly situated. If the facts had been so found, none of these contentions would have had any effect. As to the first contention, there is no doubt the Chapters entered into the contract. They were then 'employers' within the meaning of the Act, which provides:
 
 
 23
 'The term 'employer' includes any person acting as agent of employer directly or indirectly * * *.' 29 U.S.C.A. 152(2).
 
 
 24
 'It shall be an unfair labor practice for an employer * * * by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor or ganization * * *.' any labor organization * * *.'
 
 
 25
 These Chapters were held to be 'employers' by the trial examiner and the Board.
 
 
 26
 In a case where the discriminatory provision was embodied in the written contract between the Employers Association and the Union, the Association was held liable by the Board as an 'employer' although the discrimination was actually carried out in accordance with the contract by a member of that group. This Court enforced the order of the Board. National Labor Relations Board v. E. F. Shuck Construction Co., 9 Cir., 243 F.2d 519, 521. It is there said:
 
 
 27
 'There is no doubt that an employer's association such as the respondent (A.G.C., Seattle Chapter, one of the parties herein) which negotiates collective bargaining contracts on behalf of its members who engage in interstate commerce is an employer for the purpose of enabling the Board to order it not to maintain a provision of a contract affecting commerce which violates the Act.'
 
 
 28
 The finding that the Chapters were employers is affirmed.
 
 
 29
 If the provisions which the Board now promulagates had been included in the contract, the parties might still have intended to violate and might have in fact violated the law. The elimination of clauses which expressly provided for preference to union members from contracts relating to hiring arrangements has not prevented unlawful discrimination.
 
 
 30
 There are instances of unlawful discrimination under hiring contracts, the written text of which was non-discriminatory.[4] It requires no argument to establish that contracts, fair upon the face, will often cloak illegal and predatory designs and consert of action.
 
 
 31
 Applying these principles as a balance, we weigh prior opinions in analogous controversies. It has been held that the Board can announce as a rule, by its finding in a particular case, that a contract provision permitting a Union to settle seniority is illegal and violative of the Act because it tends to encourage union membership. National Labor Relations Board v. International Brotherhood of Teamsters, etc., 8 Cir., 225 F.2d 343.[5]
 
 
 32
 But a colorless provision for the maintenance of a hiring hall must be differentiated from the provision permitting a Union to settle seniority. The hiring hall is legal and has always been held so.[6] It must be remarked that the Board had, previous to the Teamsters case above cited, held a provision permitting a Union to settle seniority was legal, but reversed its position as a matter of law, and the Court of Appeals for the Eighth Circuit therefore required its order to operate prospectively only. But here the Board does not intimate that the hiring hall is per se illegal.
 
 
 33
 The principles announced in our own opinion in National Labor Relations Board v. Swinerton, 9 Cir., 202 F.2d 511, certiorari denied 346 U.S. 814, 74 S.Ct. 24, 98 L.Ed. 341, are wtill sound and must govern the instant case. It was there said:
 
 
 34
 'The Board has contended that adoption of a system of union referral or clearance also violates the Act absent a 'guarantee that the union does not discriminate against non-members in the issuance of referrals.' We do not believe National Union of Marine Cooks and Stewards, 90 N.L.R.B. 1099 (1950) supports this view. Although it was there noted that the provisions of an applicable labor contract prohibited such discrimination, the Board did not indicate that a referral system was per se improper absent a 'guarantee' of non-discrimination. Such a rule would in practical effect shift the burden of proof on the question of discrimination from the General Counsel of the Board to the respondent. The rule which we deem proper was recognized by the Board in Hunkin-Conkey Const. Co., 95 N.L.R.B. 433 (1951), where it was said an agreement that hiring of employees be done only through a particular union's offices does not violate the Act 'absent evidence that the union unlawfully discriminated in supplying the company with personnel.' 95 N.L.R.B. at 435. Cf. Del E. Webb Const. Co. v. N.L.R.B., 8 Cir., 1952, 196 F.2d 841, 845, (38 A.L.R.2d 102). In the instant case, however, the evidence discloses that the union in fact discriminated in favor of its members.' At page 514 of 202 F.2d.
 
 
 35
 The Chapters of Associated General Contractors of America advance contentions which heighten the impression that the Chapters and the individual employers were attempting to remove themselves as far as possible from any responsibility for the acts of the Union under the wide open clauses of the contract. There may be evidence from which the inference could be drawn that all concerned knew of the Union policy and that the contract was drawn loosely without protective clauses for the purpose of allowing the Local a free hand to practice discrimination. But this is not a presumption of law arising from the naked provisions of the hiring hall contract alone. It might perhaps have been found as a fact that such a hiring arrangement was commensurate with a discriminatory policy against nonmembers. It is abundantly proved in the record that a discriminatory policy was applied by the Local and that Lewis was only a flagrant example.
 
 
 36
 The Board does decide that a hiring hall contract absent certain guaranties violated the Act. But, upon the principles controlling the precedents above cited, the ruling cannot be upheld. An agreement that the hiring of employees be done through particular union offices does not violate the Act 'absent evidence that the union unlawfully discriminated in supplying the company with personnel.'
 
 
 37
 It might be logical to proceed to affirm the Board upon the ground that there was evidence to show that there were illegal practices by the Local and that the other parties combined with the Unions to effectuate the illegal design. But the Board has given this Court no such option. There is no finding of fact such as there was in Swinerton, supra. The pronouncement of the Board did not render the contract unlawful upon its face.
 
 
 38
 This does not mean that the Board, in this case upon remand or in other cases in the future, might not find as a fact that the omission of these guaranties or prohibitory clauses from a contract was evidence of an intent upon the part of the signatories and their associates to violate the Act.
 
 
 39
 Neither can the Chapters of contractors nor the council of the Union reverse the argument and say that, if the contract be not illegal per se, a priori they had no connection with the proved discrimination and unfair practice of the Local. Neither the Board nor the courts need be naive enough to believe that the contract may not have been drawn with the explicit design to give the Local free hand to accomplish the encouragement of union membership by illegal discrimination.
 
 
 40
 As an abstract proposition divorced from the facts of this case, it is possible for groups of employers and unions to agree tacitly among themselves, and with outsiders and third parties, to discriminate unlawfully against a person or class of persons in hiring arrangements and thereby unlawfully encourage union membership (8(a)(3); 8(b)(2))[7] and also restrain employees from their right to employment without engaging in union activities (8((a)(1); 8(b)(1)(A)).[8] With or without a contract, such violations are possible. It matters not whether the provisions now required by the Board are written into contract, such a combination between management and labor is not only practicable, but might, under certain circumstances, be forecast with reasonable certainty. As we understand the Board, the contract would be legal if it contained the required provisions, although it might be found as a fact that there was encouragement of union membership by such a combination through illegal discrimination.
 
 
 41
 It is apparent then that a contract which contains discriminatory provisions is illegal per se. It is also patent that a contract which is fair on its face is not unlawful in and of itself simply because it does not contain clauses prohibitory of illegal action.
 
 
 42
 It was a question of fact then whether all parties to the contract had contemplated the exertion of coercive pressures upon employees and applicants and thus acted as agents of the employers in bringing about the discriminatory conduct of the Local, which was in fact pursued with regard to Lewis. Such agents would themselves have been 'employers' under the Act. The Board, in the solution of this question, would necessarily have drawn upon its extensive experience with union-operated hiring systems and might well consider the fact that hiring arrangements, including a predecessor to the very contract in this case which expressly provided for preference to union members, continued to be common even after such clauses had been made unlawful by the 1947 amendments to the Act. It might well have considered the fact that a determination to maintain discriminatory practices in hiring halls in many industries, in spite of the provisions of the Act, was made explicit by union leaders before Congress itself. Hearings before the Senate Subcommittee on Labor-Management Relations, 81st Congress, 2d Session, pp. 62, 81-82, 87, 184, 198, 199, 213 and 215 (Government Printing Office, 1950).
 
 
 43
 This Court has announced the law quite clearly. An employer who agrees to the operation of a hiring hall in which discriminatory practices are carried on by the Union thereby aids in the enforcement of such a contract. This Court says in National Labor Relations Board v. Waterfront Emloyers of Washington, 9 Cir., 211 F.2d 946, 954-955:
 
 
 44
 'If WEW (an employers' association) bound its members to agreements whereby they were required to do all their hiring through a hiring hall in which union members were to have preferential dispatch privileges, and if WEW thereafter maintained the agreements and acquiesced in the hiring arrangement established pursuant thereto, so that its member companies did all their hiring through the established hiring hall, with the result that some persons were discriminatorily denied employment, WEW would certainly seem to have had a hand in the 'enforcement' of the agreements.'
 
 
 45
 Now we hold that an employer might be held to have enforced discriminatory policies although the contract contained no express claims to that effect. But any such inferences of fact must be drawn by fact finding agencies and not by appellate courts.
 
 
 46
 But the Board did not treat the matter as a question of fact. It is expressly said:
 
 
 47
 'The basic question herein is whether the written contract, apart from all other evidence in the case, is itself unlawful because of the exclusive hiring hall it contains. We hold the hiring hall provisions of this contract to be unlawful. For purposes of our decision, therefore, it is unnecessary to determine whether there is sufficient evidence apart from the contract to support the allegation of discriminatory practices in hiring.'
 
 
 48
 It is difficult to reconcile this statement with a subsequent expression:
 
 
 49
 'We also find, contrary to the Trial Examiner, that the implementation of the unlawful contract in the rejection of Lewis' continuous applications for employment was an unfair labor practice by both the Union and Employer Respondents. He was a clear victim of the unlawful hiring system being carried on * * * His unlawful exclusion from employment was a joint act by both Respondents.'
 
 
 50
 But we take it the latter expressions are explained by a qualifying note. This is far from a positive finding of fact.
 
 
 51
 There is another factor. The Board is qualified, by its specialized knowledge and experience in the field, to say that it will give peculiar weight to certain evidence. The common law courts have built up such rules and enforce them. There seems to be no valid reason why an administrative body cannot progress from precedent to precedent. The Board has now decided, in view of its experience, that special significance must be given to the failure to include protective clauses in these contracts. But such a rule of evidence should operate prospectively, since the burden is thereby shifted. This approach cannot be upheld in the instant case. But this Court sees no reason why the doctrine once announced could not be applied in future cases.
 
 
 52
 The Board held that, as a matter of law, a labor contract containing provisions permitting the maintenance of a hiring hall which omitted certain prohibitory stipulations was per se invalid and contrary to law. On the other hand, Mountain Pacific, the Tacoma Chapter, the Seattle Chapter, the District Council and Local 242 join together as representatives of the employers and the Unions to contend that Mountain Pacific and Washington Council negotiated a legal contract, since it contained no clauses contrary to the intent of the Act and therefore no one can be held responsible irrespective of the plainly discriminatory practices of the Local.
 
 
 53
 Neither of these extreme positions can be maintained. The cause must therefore be sent back to the Board for further consideration.
 
 
 54
 Remanded.
 
 
 55
 The foregoing opinion was prepared and signed by Judge JAMES ALGER FEE prior to his untimely death on August 25, 1959, while attending the meeting of the American Bar Association at Miami, Florida. In his passing the nation has lost a staunch, fearless and able Judge, and all who had the privilege of knowing him a sincere and warm friend.
 
 
 
 [1]
 The trial examiner found that Local 242 had violated 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C.A. 158(b)(1)(A)
 
 
 [2]
 The Board found that the Chapters had violated 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C.A. 158(a)(3) and (1), and that the Local and District Counsel had violated 8(b)(2) and (1)(A) of the National Labor Relations Act, 29 U.S.C.A. 158(b)(2) and (1)(A)
 
 
 [3]
 The provisions required to be interpolated are as follows:
 '(1) Selection of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, union membership, bylaws, rules, regulation, constitutional provisions, or any other aspect or obligation or union membership, policies, or requirements.
 '(2) The employer retains the right to reject any job applicant referred by the union.
 '(3) The parties to the agreement post in places where notices to employees and applicants for employment are customarily posted, all provisions relating to the function of the hiring arrangement, including the safeguards that we deem essential to the legality of an exclusive hiring agreement.'
 
 
 [4]
 Matson Navigation Co., 101 N.L.R.B. 1268. See also National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, Local 10, I.L.W.U., 9 Cir., 214 F.2d 778; International Brotherhood of Boilermakers, Local 207, 118 N.L.R.B. 342; J. P. Floria & Co., 118 N.L.R.B. 753; International Union of Operating Engineers, Local 542, 117 N.L.R.B. 1863; United Brotherhood of Carpenters, Local 1400, 115 N.L.R.B. 126; T. Brodsky & Son, 114 N.L.R.B. 819; Imparato Stevedoring Corporation, 113 N.L.R.B. 883; International Associated Bridge, etc., 112 N.L.R.B. 1059; Consolidated Western Steel Corporation, 108 N.L.R.B. 1041
 
 
 [5]
 Such a finding would be based largely upon the power of the Board to draw inferences
 'An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven.' Radio Ovvicers' Union of Commercial Telegraphers Union, A.F.L. v. National Labor Relations Board, 347 U.S. 17, 48-49, 74 S.Ct. 323, 340, 98 L.Ed. 455.
 
 
 [6]
 National Labor Relations Board v. Swinerton, 9 Cir., 202 F.2d 511, certiorari denied 346 U.S. 814, 74 S.Ct. 24, 98 L.Ed. 341; Eichleay Corporation v. National Labor Relations Board, 3 Cir., 206 F.2d 799; Del E. Webb Construction Company v. National Labor Relations Board, 8 Cir., 196 F.2d 841, 38 A.L.R.2d 402; The Hunkin-Conkey Construction Company, 95 N.L.R.B. 433
 
 
 [7]
 Sections of the National Labor Relations Act. 29 U.S.C.A. 158(a)(3), (b) (2)
 
 
 [8]
 Sections of the National Labor Relations Act. 29 U.S.C.A. 158(a)(1), (b) (1)(A)