**MORRISON–KNUDSEN COMPANY, Inc.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**INTERNATIONAL HOD CARRIERS, BUILDING AND COMMON LABORERS UNION OF AMERICA, LOCAL 341, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 16383, 16401.**

United States Court of Appeals
Ninth Circuit.

Feb. 19, 1960.

Allen, DeGarmo & Leedy, Gerald De-Garmo, Seth W. Morrison, Seattle, Wash., for petitioners Morrison-Knudsen Co.

Hartlieb & Groh, Anchorage, Alaska, Vincent F. Morreale, Washington, D. C., Robert J. Connerton, Joseph M. Stone, Washington, D. C., for petitioners Int. Hod Carriers.

Stuart Rothman, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Rosanna A. Blake, Nancy M. Sherman, Attys., N. L. R. B., Washington, D. C., for respondent.

Before CHAMBERS, Chief Judge, and POPE and KOELSCH, Circuit Judges.

POPE, Circuit Judge.

Following separate charges filed by one Denton R. Moore against both the petitioners to the effect that the Morrison-Knudsen Company had refused to hire Moore and certain other persons because they were not members of Local 341 and that the Union had caused the company to refuse to hire such persons because they were not members of the Union, the General Counsel filed a consolidated com-

plaint against both the Company as employer and the named Local 341.

The complaint alleged that the two respondents, Morrison-Knudsen, as employer, and Local 341, as representative of certain employees, had an unwritten agreement, arrangement or practice which governed them, whereby applicants for jobs as construction laborers were cleared by Local 341 as a condition of hire; that this arrangement "was operative at times when the officials and agents of respondent Local 341 were obligated to procure employment for members of said labor organization in preference to non-members"; that the employer used the facilities and dispatching personnel of Local 341 to determine the qualifications of the applicants seeking hire as construction laborers; that on or about June 12, 1956, membership in Local 341 was required as a condition of hire and dispatch by Morrison-Knudsen of one Morris Abolins and seven other named persons; that Morrison-Knudsen refused to treat as eligible for employment at its Big Mountain construction site any local applicants for employment until Local 341 had given preference to its members; that by the agreement, arrangement or practice described, the named respondent Morrison-Knudsen had violated secs.

8(a) (3) and 8(a) (1) of the National Labor Relations Act, as amended, and that the Union had violated secs. 8(b) (2) and 8(b) (1).[1]

After hearing upon this complaint and the answers of the employer and Union respondents, the trial examiner filed his intermediate report and recommended order. He there found with respect to Morris Abolins and four others named with him in the complaint that Morrison-Knudsen had withheld job assignments to them until they and each of them had joined Local 341; that by so doing Morrison-Knudsen had interfered with, restrained and coerced employees and prospective employees, in violation of sec. 8(a) (1); that by encouraging membership in Local 341, through refusal of employment to Abolins and the other four until they joined Local 341, Morrison-Knudsen had engaged in an unfair labor practice within the meaning of sec. 8(a) (3) of the Act; that the record did not sustain the allegations of the complaint relating to Denton R. Moore and the 25 so-called "local applicants"; and that certain other allegations of the complaint, not here material, were likewise not sustained.

During the course of the hearing, and at the conclusion of General Counsel's

---

1. The relevant portions of the National Labor Relations Act, as amended (61 Stat. 136, 65 Stat. 601, 29 U.S.C.A. § 151 et seq.), are as follows: "Rights of Employees—Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3).

"Unfair Labor Practices—Sec. 8(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: \* \* \*

\* \* \* \* \*

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: \* \* \*

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) or to discriminate against an 'employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; \* \* \*."

evidence, the trial examiner sustained a motion to dismiss the proceedings as against the Union. Accordingly the recommendations in his intermediate report were to the effect that appropriate cease and desist orders be issued against Morrison-Knudsen only, and that it be required to take affirmative action through the posting of notices and the notification of the Regional Director that it would comply with the recommendations suggested in the intermediate report.

The General Counsel and Morrison-Knudsen each filed exceptions to the trial examiner's report. Upon consideration of the report and the exceptions, the Board, referring to certain items of testimony in the General Counsel's exceptions, found that such evidence "was sufficient to establish a prima facie case of violation" by the respondent Union of the sections of the Act referred to. The Board found that the trial examiner had erred in dismissing the complaint as to the Union and set aside that ruling. It held that in view of the fact that the Union had not had an opportunity to present its defense, the case should be remanded to the trial examiner for further proceedings consistent with the decision and order of the Board, including such additional hearing as might be necessary, and the preparation and issuance of a supplemental intermediate order "with respect to unfair labor practices by the Union, alleged in the complaint." [2]

The trial examiner thereupon gave notice to the employer and the Union that the hearing was reopened and would be resumed for taking of testimony at a stated time and place. The Union thereupon notified the trial examiner that it rested, and requested that the supplemental report be based on the evidence presently in the record. The trial examiner then cancelled the notice of further hearing and proceeded to make and file a supplemental intermediate report and recommended order.

The supplemental report differed from the first one primarily in that it detailed some testimony by one Raoul Wargny, whose evidence had not even been mentioned in the original report. It was this testimony of Wargny which was alluded to by the Board when it found that it was sufficient evidence to constitute a prima facie case of violation by the Union.

In making the original report, the trial examiner had referred to and relied upon the testimony of Morris Abolins and the four other persons who were associated with him relating to their employment. These five men were members of the University of Washington football team. They had been promised vacation employment in Alaska during the summer of 1956. In his original report the examiner found that these five men were required to join the Union before they began their work and upon the basis of that finding, and of that finding alone, he concluded there had been an unfair labor practice on the part of the company.

It is clear that when he made those original findings the examiner did not credit the testimony of Wargny. He did not even mention it, and he based no findings upon the circumstances which Wargny related. However, notwithstanding the fact that the examiner thought this testimony unimportant and that he took no stock in it, yet in the preparation of his supplemental report he obviously considered that he had been ordered to credit this testimony and proceeded to recite that Wargny "credibly testified" to certain things. He also referred to the testimony of Abolins and that of the other students as he had done in his first preliminary report.

2. It is noted that by this order of the Board it found that the trial examiner erred in dismissing the complaint as to the Union. The order of remand was for findings, conclusions and recommendations "with respect to unfair labor practices by the Union." There was no direction with respect to modification of any findings, conclusions or recommendations made by the trial examiner with respect to Morrison-Knudsen.

Upon the basis of his crediting of the Wargny testimony, the examiner in his supplemental report enlarged his findings by reciting that the employer and the Union were parties to an unlawful arrangement under which all applicants for work were required to become members of Local 341; and that Local 341 had caused the employer to discriminate against the employees in violation of sec. 8(a)(3). (This finding, it will be noted, differed from that of his first report in that it found discrimination as to employees generally. The earlier report found discrimination only as respects Abolins and the four other students.) He made recommendations for cease and desist orders similar to those previously recommended by him except that he suggested that these latter orders be directed to the Union as well as the employer, and called for similar posting of notices. However, he added a further recommendation as follows: "It will be recommended that M-K and Local 341, jointly and severally, be required to reimburse to Morris A. Abolins, Ronald S. Crowe, Joel I. Garnes, William A. Wyman, and Robert Bleeck, the five University of Washington athletes referred to in the record, any and all initiation fees and dues paid to Local 341 in order to obtain employment with M-K."

All parties excepted to this report. The General Counsel excepted to it for its "failure to file an order that Respondents, jointly and severally, be required to reimburse all other employees of respondent employer [for all fees and dues paid the Union] within a period from six months before the filing of the charge to completion of the construction work."

In its final and so-called "Supplemental Decision and Order" the Board sustained this exception, but in other respects it approved the findings of the examiner's supplemental report. In sustaining the General Counsel's exception, just mentioned, the Board stated: "Therefore, as part of the remedy we shall order the Respondents, jointly and severally, to re-fund to the employees of the Company hired at Anchorage, Alaska, for work under the Western Electric contract mentioned above, all initiation fees, dues, and other moneys paid by them to the Union as the price of their employment."

Morrison-Knudsen did not except to the finding in the original report of the examiner that it had violated sec. 8(a)(3) and (1) of the Act by conditioning the employment of Abolins and the other University athletes upon their joining the Union. Hence the Board properly adopted it. But to the finding of the supplemental report that there was an arrangement that other employees, that is to say, applicants for jobs generally, were required to apply for union membership as a condition of employment, both the Company and the Union excepted, and they vigorously urge here that such finding is not supported by substantial evidence in the record considered as a whole.

The record, and the brief of General Counsel, give the impression that the Board was laboring under the view that the mere fact that the Union maintained a hiring hall and a dispatch service which was used by the Anchorage office of the employer in locating and hiring men was itself an unfair labor practice or evidence thereof. The rule is quite the contrary as this court has recently held in National Labor Relations Board v. Mountain Pacific Chapter of Assoc. Gen. Con., 9 Cir., 270 F.2d 425, 429.[3] (See the other cases cited in footnote 6 at that point.) As was stated in National Labor Relations Board v. International Ass'n, etc., 1 Cir., 261 F.2d 347, 350, "It is not illegal for an employer to rely upon a union to provide it with employees. In some industries such as construction and shipping, where much of the work is necessarily of an intermittent nature and the employer's need for workers varies from day to day, a hiring hall or referral system has sprung up. Under this system the em-

---

3. "The hiring hall is legal and has always been held so."

ployer calls upon the union to supply him with the necessary workers."

The evidence in this case shows that such was precisely the situation at these Morrison-Knudsen Alaska jobs. The conditions which always made construction work difficult were magnified here in these remote Alaskan areas. Many types of skills were required, often for short periods and on short notice. It was reasonable, if not a practical necessity, for the employer to seek the type of labor he needed where he could generally depend on finding it. This was explained by the witness Erickson who held the top executive position for Morrison-Knudsen in Alaska. After noting that the work carried on was heavy construction involving the moving of dirt and rock with expensive power equipment, he testified:

"Q. Where do you get employees to operate this equipment in your employ usually? A. We get our operators almost entirely from the union halls.

"Q. And why do you get them almost entirely from the union halls? A. The most skilled, best trained people come out of the halls. The equipment is valuable and to take a power shovel which costs $125,000

you are not going to get an unskilled person on that shovel.

"Q. Do you get direct applications from individuals for positions? A. Once in a while.

"Q. Are those persons hired? A. Very seldom unless we know them, know their history and background. If we know them and need a man, we hire them. * * *

"A. Among other things the union has generally got a better knowledge of where to get that employee in a hurry than we do." [4]

In short, the necessities which make the use of a hiring hall dispatch system a reasonable procedure were magnified in Alaska on these Morrison-Knudsen jobs. Of course if such a system, otherwise lawful, is operated in an unlawful manner so as to discriminate against non-union workers, and so as to provide only the employment of union members, then the arrangement may become an unfair labor practice. "The factor in a hiring-hall arrangement which makes the device an unfair labor practice is the agreement to hire *only* union members referred to the employer." Del E. Webb Const. Co. v. National Labor Relations Bd., 8 Cir., 196 F.2d 841, 845, 38 A.L.R.2d 402.

4. The witness further testified that there were few persons in the skilled labor classifications living at the job sites; he explained why they sought qualified men and how it was found that these skilled workmen could best be procured through the union hiring hall. Referring to some of the types of employees whom Local 341 was authorized to represent, he gave the following explanation: "One of the first ones that we were hiring was form strippers. A good form stripper will go in and remove the concrete forms rapidly and carefully, and, if he does his job right, you are able to use the forms to make a second or third or a fourth or sometimes six concrete pours using the same forms. If they are not taken off properly, you just go out and build more forms and spend some more money. We use a lot of jackhammer operators. He has a machine which costs $400 or $500. A good one can get you maybe up to two hundred feet of drill hole a shift

and a poor one would get you twenty feet. In other words, a good one would get you ten times as much as a poor one would.

"Power buggy operator is another one we use. He handles the concrete from the mixer into the forms. A power buggy is worth $1500 and takes a considerable amount of skill to handle one of them.

"Going on down, a powder man is, I would say myself, the most skilled of all the labor classifications in that he does the job right, breaks the rock up, and he does not kill anybody, including himself. If he does it wrong, you generally have several dead people around.

"A wagon driller is another one we use a lot of. They operate a machine which is again worth about $2500. A good wagon driller again will get you two hundred feet and a poor one would get no hole drilled for you."

The Board might suspect or surmise that the Union may have used its dispatch system to discriminate against non-union men, or to compel or encourage applications for membership. But such speculations are no substitute for proof of improper use of the system—much less for proof of an understanding that dispatching should be conditioned on union membership.

■ The General Counsel conceded that the formal agreement between the employer and the Union was an open shop contract,—that there was nothing wrong with it. His case depended upon showing that in actual practice, in what the parties did, they made it a closed shop. The inquiry is, was there substantial evidence of that?

There was evidence, which we think was substantial, that the employer and the union between them arranged that the five student athletes, Abolins and four others, should sign up for membership in the union before going out on their jobs. But all the circumstances shown in respect to them tends to indicate that theirs was a special case, quite out of the ordinary. In the first place, they had been promised jobs by the employer's general manager before they even left for Alaska. Shortly before they reached Anchorage, the examiner found, the company's office manager telephoned the Union business agent and told him, "These boys would be arriving soon and that they had been promised employment and would be going out to one or more of our projects as laborers." After they arrived, the Union agent was told by telephone: "The boys were in my office and would be dispatched to the job, either that day or the following day." The reply was "He would like to see them but he didn't want them to come to the hall. * * * He said the hall was full of men

and that he would like to come down to our yard and see them."

It seems plain that these five men were sure of employment and that for no other reason than that they were members of an athletic team. Equally clear is that such employment had possibilities of embarrassment to the manager of a hiring hall full of men waiting for jobs. Any man, union or non-union, depending on jobs as laborer for means to support himself and family, would not be too happy to see college athletes walk into the hall and go out with dispatch slips before him. It could be inferred that keeping these men away from the hall, and having them actually become union members, was a device to help protect the union agent against criticism from other job seekers.

But whether this is or is not the proper inference, it is plain that what was done with the athletes is no evidence of a general plan or understanding to require union membership as a condition of employment.[5] There was much solid evidence that no such understanding existed. Thus a substantial number of men, mainly local residents near the job sites, were hired without any dispatch from or reference to the union. The allegations of the complaint that there was discrimination against the 26 named "local applicants" completely collapsed.

Brady, the man mentioned in the last footnote, who was the General Counsel's witness, and the witness having the best opportunity to know the hiring arrangements (he was on the job at the time the contract with the union was made) told how the company "routed our people through the halls with dispatch slips." But his whole testimony negatived any understanding of a requirement of union membership. He explained why the company limited the number of its "named requests" to the hiring hall, and as ex-

5. The same thing is true of one isolated case described by witness Brady, an assistant to the personnel manager, who was asked what would happen when a man was requested to be dispatched and it appeared the man was in arrears in dues to the union. He said, "I can remember a case where the man came to my office and talked to me and told me that he was wanted at the job site and I suggested that he make arrangements with the union to obtain a dispatch."

plained, that action had no bearing on the charges here.[6]

■ The General Counsel, called as witnesses some eleven of the "local applicants" claimed to have been discriminated against.[7] He also called the witness Brady. None of those witnesses gave testimony to support the Board's findings. Those findings with respect to the employer, insofar as they differ from the findings of the examiner's first report, are based entirely upon the testimony of Wargny. This is the man whom the examiner (who saw him testify) refused to credit and failed even to mention until otherwise ordered by the Board. Since the examiner saw this witness testify, as the Board did not, this contrariety of opinion between the Board and the trial examiner indicates that the evidence of this witness "must be examined with greater care than when both the Board and the trial examiner are in complete agreement." Joy Silk Mills v. National Labor Relations Board, 87 U.S. App.D.C. 360, 185 F.2d 732, 742. The Supreme Court has suggested that it is appropriate "to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456.

Wargny was personnel manager for Morrison-Knudsen at Anchorage, where he hired men for its White Alice construction job, for a period of slightly less than five months from March to July, 1956. He was then discharged. He had no part in the contract arrangements or negotiations between Morrison-Knudsen and Local 341 and was not shown to know anything of his own knowledge about them. He testified that no one in authority and no superior of his had ever told him that he could not hire non-union

6. He testified: "A. There certainly was nothing ever written or was I ever instructed. Our policy, as I understood it, in the department was that we would cooperate with the various unions so that they could meet their obligations to the membership. In other words, they had fifty, one hundred, two hundred people out of work, and they had an obligation, a moral obligation, I felt, to send these people out in the order of their, the period of time that they had been out of work, and I didn't feel it fair that we should, it was our policy we didn't feel it fair to continually ask for every man by name. So we tried to cooperate by keeping some of our named requests down to a minimum."

An arrangement to provide a "first come, first served" system is not prohibited. "Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed." Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. National Labor Relations Board, 347 U.S. 17, 43, 74 S.Ct. 323, 337, 98 L. Ed. 455.

Sample responses by this witness: "Q. Do you recall any instances when Local 341 refused a named request? A. It was when a man had had a previous bad record and we expected, the business agent here in Anchorage worked with us and advised us where we had a named request and the man was likely to cause trouble at the station, had a past history of heavy drinking, and we expected the business agents to tell us, and we usually took their recommendations. Q. Do you recall any occasions when Local 341 refused to send you a particular person that you had requested other than that? A. Outside of that, no sir."

"Q. Mr. Brady, during the period of question, to your knowledge, did Local 341 ever request through your office that a man be laid off for not belonging to the Union? A. No, sir, that has never occurred."

7. Anelon, Jack and Robert Drew, Endru, Enolon, Moore, Olympic, Rickteroff, Tretikoff, and Ira and Maxim Wassalie. These men all testified that no one told them they had to be union members in order to work with the exception of Jack Drew. He said that about a month after he went to work a union job steward told him he had to join the union if he kept on working. The undisputed evidence of the manner in which the company hired Drew and other "local applicants" without regard to union status shows that if a steward made such a statement it was not only unauthorized but false as well.

people and that as a matter of fact he could hire non-union people. He testified: "Q. Mr. Wargny, while you were personnel manager for M-K, were you ever told or were you aware of any agreement between M-K and the union to the effect that only union men would be hired and that the company would use the union hall as its sole source of recruitment for labor? A. No, sir. Q. You knew of no such agreement, neither oral or tacit? A. No, sir."

Wargny did testify with respect to the five University athletes, at one time stating that he had told them that they would have to join the Union, and in the next preceding answer stating that "I never said they had to join the union or anything like that because I did not have to." As previously indicated, the situation of the five University athletes was a special one and most of the testimony with respect to the manner in which they were employed and dispatched and requested to join the Union came from witnesses other than Wargny; and that testimony showed, we think, that as to the five students, the Union was as guilty as the employer.

When we inquire what there was in the testimony of Wargny which could have prompted the Board to find, contrary to the examiner's initial belief, that there was any general arrangement between Morrison-Knudsen and the Union for use of the Union dispatch system to prefer union men and to discriminate against non-union men, we note that the Board may have been misled by certain assumptions and statements initially made by Wargny in his testimony but which evaporated as his examination progressed and during his cross-examination. Thus near the outset of Wargny's testimony he related how the Union would be notified of the need for men and the Union would send a man with a dispatch slip, and continued: "Q. What would you do in a case of that sort? A. We would call up the union and ask them, if we could, if the man was in good standing and he was eligible to be dispatched for hiring." He was then testifying about what happened

when the site superintendent asked for a particular person. That testimony taken in isolation was actually misleading. It sounds as if Wargny was talking about the man being in good standing with the Union. That such was not the case became clear when he was asked about this matter on cross-examination:

"Q. What if it was a named request? A. If they were available and in good standing, they would dispatch them.

"Q. How do you know whether or not they're in good standing or not? A. Through our records and theirs. If he had worked for us previously and had a good record with the company, we would hire him again.

"Q. What do you mean by good standing? A. A man that hadn't been discharged from his job before or he had an eligible for rehire slip, eligible rehire in his folder, which we maintain in the personnel department in Anchorage.

"Q. That's Morrison-Knudsen's slip? A. Right.

"Q. When you say he is eligible for rehire, you mean so far as Morrison-Knudsen is concerned? A. That's right."

Again this witness undertook to testify as to his understanding that when a stated number of men were needed the company was allowed to specify the names of only half of the men to be dispatched and employed. He said: "We were allowed to ask for 50 per cent of the requisition. If there were ten hires or ten names requested, say for laborers, as an instance, we were allowed to request five men."

Wargny's superior, who, differing from Wargny, had actually dealt with the Union and knew of his own knowledge what the arrangement was, as Wargny did not, testified that there was no such understanding relating to a percentage of named employees. Brady told, as above stated (note 6), how this matter was handled, and why.

But even assuming the truth of this statement by Wargny, it cannot be said to be evidence of an illegal hiring arrangement for the reasons we have previously indicated. There is nothing impermissible about an arrangement which would fairly provide for protecting the men who had been standing in line the longest.

Wargny testified that all men who arrived to go to work reported with a dispatch slip from the Union. If he wanted to hire the named person whom he contacted the individual would go to the Union to get his dispatch slip. The men always had a dispatch slip when they arrived. Then followed this interesting bit of testimony:

"Q. You told each employee whom you called, and I am now referring to past employees whom you wanted to rehire or from whom company records had appeared to be available and satisfactory to the company, is it your testimony that when you contacted those employees you told them that they would have to go to the union to get a dispatch slip? A. If they were members of the union, yes.

"Q. You did that in each instance? A. Yes.

"Q. Why did you do that? A. Because you had to have them cleared through the union. They had to have a clearance before we could hire them.

"Q. Where did you get that information? A. It was just natural procedure.

"Q. Who so advised you? A. Nobody advised me so far as—well, I can't say exactly as to who definitely advised me."

The real basis for all this testimony by Wargny was revealed when he then proceeded to testify: "Q. May I ask is joining the union and getting a dispatch slip the identical thing? A. You have to join the union first before you can get a dispatch slip. Q. Do you know that? A. I assume that."

The findings of the Board were thus based on testimony by a man who was not shown to have any knowledge whatever as to the arrangements or understandings between the Union and the employer. His opinions and conclusions as to whether the Union dispatched only union men were based upon what he "assumed", and his opinion of what was "natural procedure."

The picture is almost identical with that which was described by Judge Woodrough for the Eighth Circuit in Del E. Webb v. National Labor Relations Board, supra, 196 F.2d at page 846, as follows: "It can readily be seen that the Board's conclusion that a November 15 agreement was entered into is based on inferences and suspicions drawn from remote circumstances, and is in conflict with the direct testimony on the point. As a further example, the Trial Examiner states in his opinion that, 'Brown (the carpenter foreman) also testified that although Webb and the Union had not set down and entered into any agreement for the hiring of only union men, it was "just understood that they would be."' That the Trial Examiner should call attention to such an insignificant statement is surprising, but it is more surprising that he evidently gave it some weight. The statement is not only hearsay, but is apparently hearsay founded on rumor." As in that case we cannot but conclude that apart from the findings with respect to the five students, there is no evidence to support the finding of the Board that the company and the Union participated in an arrangement that required applicants for jobs as laborers to obtain dispatch slips from the Union which were issued only after application had been made for membership in the union.

As stated in the case last cited, (196 F.2d at page 847), "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." That case, like this, was one in which the union maintained a hiring hall arrangement to which the company agreed.

All witnesses who knew the facts and who testified here unequivocally stated that there was no agreement to hire only union laborers. When Wargny was asked if he knew any case where the union was notified that the company sought to employ a man who was not a member of the union, and in which the Union had refused to dispatch the man, he could only recall one case and his testimony with respect to that was as follows: "Well, one case I remember was that the individual that was requested was not a member of the Union and they had so many men on the bench that had priority that they didn't want to accept any more." The answer showed that this was simply the case of discrimination in favor of the man waiting on the bench for employment. This situation we have previously noted. We know of no rule prohibiting that method of operating a hiring hall.

■ In reviewing this record, and all of it, we are charged with "responsibility for assuring that the Board keeps within reasonable grounds." The Board's findings must be set aside when the record, as here, "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

■ The problem is, are the findings supported "by substantial evidence *on the record considered as a whole?*" In making that evaluation we "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. National Labor Relations Board, supra, 340 U.S. at pages 485, 488, 490, 71 S.Ct. at pages 463, 464. On studying this record we are compelled, in the words of Universal Camera, to conclude that we "cannot conscientiously find that the evidence supporting [the Board's] decision is substantial when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Id., 340 U.S. at page 488, 71 S.Ct. at page 465.

■ In our view, aside from the proof as to the five students, "the evidence relied on to support the finding consists of suspicions, unfounded conclusions and surmises, and inferences." Del E. Webb v. National Labor Relations Bd., supra, 196 F.2d at page 847. "[W]e are functioning within our proper sphere when we say that mere speculation is not sufficient to uphold a finding of an unfair labor practice." National Labor Relations Board v. Thomas Rigging Co., 9 Cir., 211 F.2d 153, 158.

■ This brings us to an entirely different and independent point in the case. Even if we were wrong in what we have here said as to lack of any substantial evidence to sustain the Board's finding of a general understanding which applied to employees other than the five students, to the effect that joining the Union was a condition of employment, a substantial part of the remedy ordered by the Board cannot stand.

We refer here to the Board's requirement that the employer jointly with Local 341 refund to its present and former employees hired at Anchorage, all initiation fees, dues and other moneys paid as a condition of membership in that local. This liability, it will be recalled, was to relate to a period of six months prior to the date of the filing of the charge and extended to all moneys thereafter collected. This would cover a period beginning April 2, 1956, and extend nearly 34 months to the date of the Board's final order of January 29, 1959. Nothing in the record shows how many employees would be the third party beneficiaries of that order. Portions of the record indicate that the number may have been as high as two thousand. How long these employees worked or what dues they paid does not appear, and there is no way to tell from the record.

In his supplemental intermediate report, the trial examiner recommended that the employer and the union jointly and severally reimburse the five students for the initiation fees and dues paid the local union. No fault can be found with such an order for it may be inferred

that these students paid those sums solely in consequence of the improper arrangement whereby they were required to join the union in order to get their jobs. Such an order under those circumstances finds support in the decision of the court in Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1518.[8] That was a case in which all employees affected by the order were compelled to join the union. "They had to remain members to retain their jobs." Compulsion was proven as to all of them.

Similar authority for the type of reimbursement recommended by the trial examiner is to be found in National Labor Relations Board v. Local 404, etc., 1 Cir., 205 F.2d 99. There it appeared that 31 employees, who were named and identified in the record, joined the union under protest. Finding that there had been such coercion as to constitute an unfair labor practice, the Board required respondent union to refund to those 31 employees, who, the Board found, had thus joined under protest, all initiation fees and dues which the union collected from them.

In contrast to that case, the facts here are such that the omnibus refund order directed by the Board cannot be sustained under the principles laid down in these authorities. Consideration of what was said by the Court in Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, readily demonstrates the punitive and penal character of the remedial order here attempted. Unlike the case of the five students, no other identifiable union members who worked on the job can be shown to have been in any manner coerced in joining the union. No effort was made even to show when these men joined the union. Practically all of them

may have belonged for years. Local 341 represented a substantial number of skilled or semi-skilled work categories such as carpenter tenders, form strippers, pneumatic or power tool operators, jackhammer operators, powdermen, drillers, timber fallers, chain and power saw operators, saw filers, and the like. It would be surprising if many of these men had not been members of the union or some of its branches for many years. At any rate, nothing is shown in this record to negative that probable situation.

None of these men are in any sense parties to this proceeding. They are not within any class of persons whom the Board was here undertaking to protect. They are strictly third parties in the sense that the United States Government was a third party in the Republic Steel Corp. case, supra. In that case the corporation had engaged in unfair labor practices from which it was ordered to desist, and it was ordered to withdraw recognition from a labor organization dominated by the company. It was also ordered to reinstate with back pay certain employees who were found to have been discriminately discharged. The Board in providing for back pay, deducted from the payments the amounts of such sums which the Government had provided by way of relief benefits and these sums were ordered to be paid by the respondent company to the Government. In holding this latter requirement to be unenforceable, the Court said:

"We think that the theory advanced by the Board proceeds upon a misconception of the National Labor Relations Act. The Act is essentially remedial. It does not carry a penal program declaring the described unfair labor practices to be crimes. The Act does not prescribe penalties or fines in vindication of public

---

8. The respondent company had established and set up a company-dominated union known as I.O.E. An arrangement was made for check-off by the company of union dues to I.O.E. Employees who refused to join I.O.E. were discharged. It thus appeared that the moneys withheld for dues and paid to the company-dominated I.O.E. were collected through compulsion from each of the employees. Said the Court: "The result was that the employees, under the I.O.E. by-laws, had to authorize wage deduction for dues to remain members of the I.O.E. and they had to remain members to retain their jobs."

rights or provide indemnity against community losses as distinguished from the protection and compensation of employees. * * *

"All these measures relate to the protection of the employees and the redress of their grievances, not to the redress of any supposed public injury after the employees have been made secure in their right of collective bargaining and have been made whole.

* * * * * *

"This language should be construed in harmony with the spirit and remedial purposes of the Act. We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act. We have said that 'this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board may be of the opinion that the policies of the Act might be effectuated by such an order.' We have said that the power to command affirmative action is remedial, not punitive. * * * We adhere to that construction.

"In that view, it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end." 311 U.S. at pages 10, 11, 12, 61 S.Ct. at page 79.

That holding is in line with the opinion of Judge Hand for the Second Circuit in Western Union Tel. Co. v. National Labor Relations Board, 113 F.2d 992,

997. That case held improper a refund direction not to be distinguished from the one presently under consideration. Said the Court: "Nor will it do any good to assume,—as we do arguendo—that under the guise of 'affirmative action' the Board may make itself the vicarious representative of each employee who may have in fact suffered pecuniary damage; the vice is that the act did not create a mass tort by which either a particular employee, or the Board for all, could dispense with the proof that the 'unfair labor practice' actually impinged upon the putative victims and caused them pecuniary damage. It by no means inevitably follows, because an employer has so conducted himself towards a union as to disqualify it from acting as a collective bargaining agent for all his employees, that he has inflicted pecuniary damage upon each member of that union. Here at any rate there was no evidence that all those who asked to have their wages stopped, did so in any part because they were coerced. So far as appears, many of them may have liked the Association for its own sake, quite independently of anything that the Company did to coax or compel them to join; they may have preferred it to any alternative then available; either to an affiliated union, or to no union at all."

In his concurring opinion in Virginia Electric Company v. Board, supra, Mr. Justice Frankfurter pointed out the significant distinction between cases like this one and Western Union Tel. Co., supra, on the one hand, and the Virginia Electric Co. case, on the other, and that in the latter case the Board was justified in finding that the employees had made payments under compulsion. He said, 319 U.S. at page 545, 63 S.Ct. at page 1221: "If the controlling facts in this case were like those in Western Union Tel. Co. v. Labor Board, * * * I too, would accept the reasoning of Judge Learned Hand's opinion in that case and join my brother Roberts. But the vital difference between the Western Union and this case is that in the former 'there

was no evidence that all those (employees) who asked to have their wages stopped, did so in any part because they were coerced.' * * * Here the employees had no such choice; they could avoid the check off of union dues only by giving up their jobs."

It is thus worthy of note that in the Virginia Electric case the Court did not undertake to disapprove any of the eleven decisions of the five circuits cited in its first footnote,—all of which disapproved Board orders requiring reimbursement of check-off dues. What the Court did in Virginia Electric was to point out that such reimbursement orders were proper where they benefited specific employees shown to have made their payments of dues under compulsion, as in National Labor Relations Board v. Local 404, supra.[9] Here, on the contrary, reimbursing a lot of old-time union men could not be "anything but a windfall to the employees and an unjust penalty to the employer." National Labor Relations Board v. American Dredging Co., 3 Cir., 276 F.2d 286.

We hold therefore that the reimbursement order of the Board, as distinguished from the proper reimbursement order recommended by the examiner, is punitive, penal, non-remedial and an unauthorized requirement of payment to third persons not shown to have been in any manner damaged by the asserted unfair labor practice.

■ The order of the Board also contains in broad language which this court has repeatedly disapproved, orders against the employer to cease and desist from "in any other manner" interfering with the rights guaranteed in Section 7; or from encouraging membership "in any other labor organization". In respect to respondent Union, it makes similar broad cease and desist orders against causing "any other employer to discriminate against employees", and against "in any other manner restraining or coercing employees" regarding their Section 7 rights. The order must be modified to delete these so-called "broad orders." National Labor Relations Board v. Express Publishing Company, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930, National Labor Relations Board v. Lamar Creamery Co., 5 Cir., 246 F.2d 8, and cases there cited.

The order of the Board is modified by striking therefrom the broad injunctive provisions above described, particularly subdivision (b) of paragraph 1 of the "cease and desist" directions to the respondent company; subdivision (c) of paragraph 1 of the similar directions to the Union, and the words "or any other employer" in subdivision (b) of the last mentioned paragraph. The requirement in subdivision (a) of the paragraph numbered 2 of the Board's list of required affirmative actions, wherein employer and the Union are required to refund initiation fees, dues and other moneys to "all present and former employees of Morrison-Knudsen hired by it at Anchorage, Alaska, under its cost-plus contract with Western Electric Company," is deleted and stricken, and there is substituted in place thereof the requirement recommended by the examiner, that the employer and the Union reimburse the five University athletes for all fees and dues paid by them to the Union, as stated in subdivision (a) of paragraph 2 of the statement of recommended affirmative action in the examiner's Supplemental Intermediate Report.

The finding of the Board, adopting a finding in the said supplemental report, that the Company and the Union, with respect to hirings at Anchorage, Alaska, participated in an arrangement that required applicants for jobs as laborers to obtain, as a condition of employment, dispatch slips from the Union, which were issued only after application had been made for membership therein, is hereby set aside, and the order is modified by inserting, in lieu thereof, a finding and conclusion, in language similar to that

9. This point was overlooked in National Labor Relations Board v. Broderick Wood Prod. Co., 10 Cir., 261 F.2d 548, 558, and

in Dixie Bedding Manufacturing Co. v. N.L.R.B., 5 Cir., 268 F.2d 901, 907.

of the First Intermediate Report, that the Employer and the Union participated in an unlawful arrangement and were guilty of unfair labor practices, and violated, respectively, section 8(a) (1) and (3) of the Act, and section 8(b) (1) (A) and (2) of the Act, by withholding "job assignments to Abolins, Crowe, Garnes, Bleek, and Wyman, the University athletes aforesaid, until they, and each of them, had joined Local 341."

Appropriate modifications in the required posted notices and in other formal parts of the order, to make them confrom to this order, are likewise required.

While the record shows no petition of the Board for enforcement, we understand section 10(f) of the Act, (Title 29 U.S.C.A. 160(f)) contemplates such a decree in a case of this kind. Accordingly, the order of the Board is modified as above stated, and ordered enforced as modified.