276 F.2d 594
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
E & B BREWING COMPANY, Inc., and Drivers and Helpers Local No. 38, International Union of United Brewery, Flour, Cereal, Soft Drink & Distillery Workers of America, AFL-CIO, Respondents.
 No. 13936.
 United States Court of Appeals Sixth Circuit.
 April 5, 1960.
 
 Rosanna A. Blake, Washington, D. C. Thomas Roumell, Detroit, Mich. (Stuart Rothman, Thomas J. McDermott, Marcel Mallet-Prevost and Betty Jane Southard, Washington, D. C., on the brief), for petitioner.
 James C. Paradise, Cincinnati, Ohio (Winn Newman, Cincinnati, Ohio, on the brief, Hicks G. Griffiths, Detroit, Mich., on docket), Cincinnati, Ohio, for respondents.
 Before SIMONS and POPE, Circuit Judges, and KENT, District Judge.
 POPE, Circuit Judge.
 
 
 1
 The petitioning Board seeks enforcement of its order finding that in the discharge of one Pfeifle, an employee, both the respondent Company and the respondent Union had been guilty of unfair labor practices,[1] and ordering Pfeifle's reinstatement with compensation for loss of certain back pay.
 
 
 2
 The examiner refused to credit testimony of Pfeifle that he had been discharged at the instance of the Union because of non-union membership. He found that the sole reason for the discharge was the Union's insistence "upon compliance by the Company with the hiring hall clause of its contract,"[2] that Pfeifle had attempted "to secure preferential treatment" and "sought to circumvent the legal and regularly required employment procedures" under which new employees must be engaged through the hiring hall; that the hiring hall "was being run in a nondiscriminatory manner," and he recommended that the complaint be dismissed as to both respondents.
 
 
 3
 The Board reviewed the rulings made by the examiner at the hearing, and affirmed them. On consideration of the Intermediate Report and the entire record the Board decided that it "hereby adopts the findings of the Trial Examiner but not his conclusions or recommendations." It then concluded that the Company and the Union had violated the sections of the Act previously referred to in maintaining their hiring hall agreement, holding that "an exclusive hiring hall contract was unlawful unless it explicitly provided for three safeguards" of the sort prescribed in the Board's opinion in Mountain Pacific Chapter of the Associated General Contractors, Inc., et al., 119 N.L.R.B. No. 126A, handed down subsequent to the Intermediate Report in this case.
 
 
 4
 The first infirmity in the Board's conclusion is that the decision in Mountain Pacific, on which it relies, was held erroneous in N. L. R. B. v. Mountain Pacific Chapter of Assoc. Gen. Con., 9 Cir., 270 F.2d 425, where the Board's petition for enforcement of that order was denied. The decision of that case that such a hiring-hall agreement, either with or without the so-called "safeguards" or "protective clauses", is not per se illegal, has been further restated and reemphasized by that court in Morrison-Knudsen Co. v. National Labor Relations Board, 9 Cir., 276 F.2d 63. This court, in National Labor Relations Board v. F. H. McGraw & Co., 6 Cir., 206 F.2d 635, 640, 641, recognized the same rule, citing with approval two of the cases which the Ninth Circuit decisions followed.[3] Such is the general rule stated by the courts. Other decisions, in accord, are cited in Morrison-Knudsen, supra. The only case indicating a contrary rule is that of a divided court in Local 357, International Brotherhood of Teamsters, etc. v. National Labor Relations Board, D.C.Cir., 275 F.2d 646. The majority opinion, which neither states the facts nor discusses the law, does not appeal to us.
 
 
 5
 The Board acknowledges that its practice and rulings heretofore, at least prior to its Mountain Pacific ruling, have proceeded upon the theory that "we have not found a provision that personnel be secured through the offices of a union violative of the Act absent evidence that the union unlawfully discriminated in supplying the Company with personnel." (The quotation is from The Humkinconkey Construction Company, 95 N.L. R.B. 433, 435.)[4] As the Board puts it, its prior practice "was to correct hiring hall abuses as they arose in individual cases rather than to treat the hiring hall itself." Now, however, the Board tells us it finds its prior rulings to be unsatisfactory. It says that the legality of exclusive hiring halls "had not been comprehensively treated by the Board in its decisions prior to Mountain Pacific."
 
 
 6
 The Board explains at great length why it believes a new approach and a new rule is necessary. It says its old "case-to-case method" where the Board always "predicated its decision upon the existence of discriminatory practices apart from the effect of the contract" was "no longer sufficient", it had proven ineffective so that now it was necessary to "deal with the legality of hiring halls on a comprehensive basis."[5] This comprehensive basis involves the Board's determination here, in the words of its brief, that "the undeniably discriminatory result of the exclusive hiring hall flows as much from the agreement itself as from the illegal operation of the halls of some unions," and that "illegal discrimination against nonmembers is inherent in the hiring provision itself."[6]
 
 
 7
 As we understand the Board's position, it is that its experience proves that its effort to pick off the sour fruit frequently appearing on the hiring hall tree has been ineffective and altogether frustrating, so now it proposes to chop down the whole tree whenever it is not propped up by the Board's three "protective clauses."[7]
 
 
 8
 That the rule here contended for is a new one is noted by the Board's statement in its brief: "The case at bar is the first case in which the Board has explicated to this Court its reasons for finding that an exclusive hiring agreement violates the Act even though it may not on its face give preference in employment to members."
 
 
 9
 There is no doubt that the Board has power, in appropriate cases, and in furtherance of its delegated function of making the National Labor Relations Act work, to establish new rules. What may be called new rules may stem from two sources or theories of power. One is the broad grant of power in § 6 of the Act (29 U.S.C.A. § 156) authorizing the Board "to make * * * in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of this subchapter." The manner prescribed by the Administrative Procedure Act is stated in §§ 3 and 4 of that Act (5 U.S.C.A. §§ 1002, 1003), and calls for appropriate publications in the Federal Register, and in some cases for notice and an opportunity to be heard. Perhaps the Board might have saved itself a lot of trouble by utilizing this method of making a rule. At any rate, plainly it did not call on this source of power.
 
 
 10
 A second mode by which new rules sometimes come into being is through the process of administrative adjudication. Just as courts generally do not hesitate to announce new rules to govern novel or changed conditions, so administrative boards often lay down new so-called "interpretative" rules. What the Board is authorized to interpret is the provision of § 8(a)(3) condemning discrimination in regard to hire which, in the language of Radio Officers v. National Labor Relations Board, 347 U.S. 17, 48, 74 S.Ct. 323, 340, 98 L.Ed. 455, has "a tendency to encourage" membership in a union.
 
 
 11
 We disclaim any suggestion that because, in past years, the Board has never held that an exclusive hiring-hall agreement, on the face of it, has such a tendency, it may not now, through a proper adjudicatory process, rule that it does indeed have such a tendency. "One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372. And the Board's first interpretative decision does not have to be the final one.[8]
 
 
 12
 But while we have no occasion here to doubt that an administrative board, may, as the courts have always done, declare new rules through a process of case to case adjudications, yet we think this Board has not properly done so in this particular case, and that for two separate and distinct reasons.
 
 
 13
 First, without considering whether such is a requirement of due process, we note that § 5 of the Administrative Procedure Act (5 U.S.C.A. § 1004) provides that "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing * * * (a) Persons entitled to notice of an agency hearing shall be timely informed of * * * (3) the matters of fact and law asserted." Here there was not only no complaint charging that the hiring hall agreement was illegal, or that, in the words of the Board's belated position, "illegal discrimination against nonmembers is inherent in the hiring provision itself", but it was ruled, both by the examiner and the Board itself, that the validity of the hiring hall was not in issue.[9]
 
 
 14
 We hold that the Board cannot establish its attempted rule by an adjudication of a matter not in issue before it. In the absence of the statutory notice of "the matters of fact and law asserted" the Board lacked power to pass upon any such issue as that now tardily argued in its briefs.[10]
 
 
 15
 There is a second reason why we think the Board cannot apply its newly conceived rule in this case. This becomes apparent when it is noted what the Board is trying to do here. In an effort to minimize the effect of the Board's order its brief contains some statements which are not quite consistent with its main argument. Thus it says: "The only substantial affirmative action [the order] imposes upon either party is that it requires the reinstatement of Pfeifle with back pay." It says "the Board is not requiring the Company or the Union to insert any clauses in their contract." And in response to the Union's argument that the Mountain Pacific Rule may not be applied retroactively to the instant case, the brief says that "the only portion of the Board's order which has any retroactive effect is that which requires respondents to make Pfeifle whole for any loss he may have suffered by reason of the discrimination against him."
 
 
 16
 Nothing could be more unrealistic. For Pfeifle, although only one man, furnishes the test case through which the Board now seeks to procure an adjudication that the respondents were guilty of an unfair labor practice solely and only because their hiring-hall contract, perfectly legal and valid according to the Board's settled rule at the time it was made, has now, retroactively, been adjudged per se illegal for want of one of the Board's three protective clauses demanded under its new ruling. The Board's doctrine would retroactively invalidate every union contract which contains an exclusive hiring hall provision. If the Board's order stands, it is doubtful if even the Board can say how many hundreds or thousands of employers and unions are, as of now, guilty of similar unfair labor practices.
 
 
 17
 It is not suggested that under no circumstance may an administrative ruling apply retroactively. Indeed, as suggested in Securities and Exchange Comm. v. Chenery Corp., 332 U.S. at page 203, 67 S.Ct. at page 1581, any "case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency." But in particular cases, for a board to make its new ruling retroactive may well be an abuse of discretion. And this court, under the Administrative Procedure Act, § 10(e) (Title 5, § 1009(e) is required to "hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion. * * *" We think the sound principle applicable is that stated in National Labor Rel. Bd. v. National Container Corp., 2 Cir., 211 F.2d 525, 534, as follows: "It is well settled that where, as here, an administrative agency in pursuance of its adjudicatory function makes an ad hoc change in one of its administrative policies, such change may be applied retroactively in an appropriate case. Securities and Exchange Comm. v. Chenery Corp., 332 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995]. The test is whether `the practical operation of the Board's change of policy * * * [will] work hardship upon respondent altogether out of proportion to the public ends to be accomplished.' N.L.R.B. v. Guy F. Atkinson Co., supra, [195 F.2d 149] * *." This is in accord with the limitations upon retroactivity which were recognized in the Chenery Corp. case, supra, where it was noted that "ill effect of the retroactive application of a new standard" must be balanced against the necessities of the public. In weighing these matters here we are impressed with the fact that there appears no reason why the public interest demands that the new rule be imposed at once, and now, as to this particular contract.
 
 
 18
 We are of the opinion that here, as in the case of N.L.R.B. v. Guy F. Atkinson Co., 9 Cir., 195 F.2d 141, 149, 151, from which the Second Circuit quoted, the Board's change of rules would work hardship upon respondents "altogether out of proportion to the public ends to be accomplished." As we have noted above, the Board has ample ways of instituting new rules without working any such hardship on these particular respondents.
 
 
 19
 We hold that its attempted retroactive action here was, in the words of the Atkinson case, supra, "agency action which we are directed by § 10 of the Administrative Procedure Act to set aside as arbitrary, capricious, and an abuse of discretion."
 
 
 20
 Enforcement of the Order is denied, and the Order is set aside.
 
 
 
 Notes:
 
 
 [1]
 The charge was that the Company violated § 8(a) (3) and the Union § 8(b) (2) and 8(b) (1) (A) of the National Labor Relations Act (61 Stat. 136, 65 Stat. 601, 29 U.S.C.A. § 151 et seq.), the relevant portions of said Act here applicable being as follows:
 "Right of Employees — § 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a) (3).
 "Unfair labor practices — § 8 (a) — It shall be an unfair labor practice for an employer —
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § 7;
 * * * * *
 "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *
 * * * * *
 "(b) It shall be an unfair labor practice for a labor organization or its agents — (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in § 7; * * *
 "(2) to cause or attempt to cause an employer to discriminate against an employee * * * with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *."
 
 
 [2]
 This clause in the collective bargaining agreement between the Company and the Union was as follows: "The employer agrees that in the event he shall require additional employees in the classifications of employment covered by this agreement, he shall notify the employment office operated by the Union. In the event that said employment office is unable to supply help satisfactory to the employer within twenty-four (24) hours following the request, the employer shall be free to hire in the open market. If a vacancy must be filled immediately, the employer shall nevertheless notify the employment office and if satisfactory help cannot be supplied to meet the employer's requirement the employer may hire from the open market but before filling the vacancy permanently he shall consider applicants referred by the Union within said twenty-four (24) hours. The facilities of the employment office operated by the Union shall be made available to both members and non-members of the Union and the Union warrants that in the operation of said employment agency and referrals to the employer, it will not discriminate against any individual applicant for employment because of non-membership in the Union, or otherwise restrain or coerce such applicant because of non-membership in the Union."
 
 
 [3]
 National Labor Relations Board v. Swinerton, 9 Cir., 202 F.2d 511; Del E. Webb Construction Co. v. National Labor Relations Board, 8 Cir., 196 F.2d 841, 846. In our McGraw case the hiring agreement on its face gave preference to union members. Hence the finding of unfair labor practices was upheld
 
 
 [4]
 That rule, as stated by the courts, has been: "It is not illegal for an employer to rely upon a union to provide it with employees"; National Labor Relations Board v. International Ass'n, etc., 1 Cir., 261 F.2d 347, 350); "[t]he factor in a hiring-hall arrangement which makes the device an unfair labor practice is the agreement to hireonly union members referred to the employer." Del E. Webb Const. Co. v. National Labor Relations Bd., 8 Cir., 196 F.2d 841, 845.
 
 
 [5]
 The Board's brief lists at great length cases which it says demonstrate that the Board's case by case effort to treat the "specific abuses only" resulted merely in a continued open flouting of the Act's prohibitions against compulsory unionism; that "in case after case, unions continued to accord preference to members even after Board orders forbidding them to do so", and even "after the Board's orders had been enforced by the Courts of Appeals."
 
 
 [6]
 Says the Board: "Simply stated, on the face of the exclusive hiring agreement the employer agrees to discriminate by refusing to hire an applicant or by discharging an employee who does not go to the union hall or follow the union's hiring procedures."
 
 
 [7]
 In its original Mountain Pacific decision, 119 N.L.R.B. at 897, the Board ruled that an exclusive hiring hall agreement must contain the following protective clauses: — "(1) Selection of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, union membership, by laws, rules, regulations, constitutional provisions, or any other aspect or obligation of union membership, policies, or requirements. (2) The employer retains the right to reject any job applicant referred by the union. (3) The parties to the agreement post in places where notices to employees and applicants for employment are customarily posted, all provisions relating to the functioning of the hiring arrangement, including the safeguards that we deem essential to the legality of an exclusive hiring agreement."
 The agreement involved in this case included clauses (1) and (2). Only (3) was missing.
 
 
 [8]
 "Hence we refuse to say that the Commission * * * was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct." Securities and Exchange Comm. v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995
 
 
 [9]
 The ruling of the examiner appears in a footnote to the Intermediate Report, as follows: "After having rested his case and during the cross-examination of a union witness, the General Counsel suddenly sought to show an illegal administration of the hiring hall. As the complaint against the Union contained no allegation of such an unfair labor practice and as no evidence to that effect had been adduced during the General Counsel's case-in-chief, the undersigned ruled the proposed attack on the hiring hall as such incompetent. During the colloquy following this ruling, the General Counsel appeared to agree with said ruling when he stated: `We are not trying to throw out the whole hiring hall. We are saying there was discrimination with respect to the individual himself.'" The matter then referred to appears in the transcript of the hearing as follows:
 "Trial Examiner: Are you attacking the hiring hall in this case? Mr. Corenman: Yes, we are. We are contending it is a discriminatory hiring hall. Mr. Paradise: Mr. Trial Examiner, if he is, he has rested his case. He hasn't put in any proof on it, and I don't think he can now. Mr. Corenman: I think we have ample proof to argue this case. Trial Examiner: I didn't see anything in the complaint that led me to believe there was any attack on the hiring hall. If you can show it to me, I'll be — Mr. Corenman: Yes, I'll be glad to do that, Mr. Examiner. Trial Examiner: This is the first I've recognized there was an attack on the hiring hall.
 * * * * *
 "Mr. Paradise: Mr. Trial Examiner, I want to press my objection, in part (apart) from the fact that I agree with you, there is no attack on the hiring hall in this complaint. The General Counsel has rested his case. He has put in his evidence on the hiring hall. This witness was not questioned about the referral practices of the union in his direct testimony. There is absolutely no warrant for counsel for the General Counsel roping (reopening) this case on cross-examination on the hiring hall issue. Trial Examiner: What evidence is there in your case in chief as to the attack on the hiring hall? Mr. Corenman: Mr. Examiner, the evidence is Pfeifle himself was not referred to the job because he had been expelled from the union for letting his withdrawal card lapse, and they were not referring him for that reason. Pfeifle has so testified, and so did Rieg. And, furthermore, Pfeifle was also being discriminated against in the discriminatory operation referral system in that they were making an exception of Pfeifle and would not refer him, would not in any case refer him to the E & B Brewery, because that was his last employer when his withdrawal expired and he was expelled, and we have testimony on that score from both Pfeifle and Rieg. Trial Examiner: I don't understand that as an attack on the hiring hall. Mr. Corenman: That shows the hiring hall was discriminatorily administered with respect to Pfeifle. If it was discriminatorily administered with respect to Pfeifle, then, of course, there is a violation of section 8(b) (2) and section 8(a) (3). Trial Examiner: That doesn't bring the whole hiring hall into the question. I'll sustain your objection. Mr. Corenman: We are not trying to throw out the whole hiring hall. We are saying there was discrimination with respect to the individual himself. Trial Examiner: I'll take any evidence you have on discrimination as far as Pfeifle is concerned, but as far as going into the hiring hall, I see no reason to go into it. Mr. Corenman: Mr. Examiner, when counsel attempts to bring in evidence that he has a non-discriminatory hiring hall, I think I am entitled to attack it whenever he brings it into issue with his own testimony. Mr. Paradise: I haven't brought that in with this witness at all. Trial Examiner: I don't believe it's been brought in. I'll sustain the objection. You may proceed."
 Said the Board: "The Board has reviewed the rulings made by the Trial Examiner at the hearing and finds that no prejudicial error was committed. The rulings are hereby affirmed."
 The Board's brief here concedes that "the validity of the contract was not an issue at the hearing." See Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129: "Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command."
 
 
 [10]
 The Board attempts to avoid this result by two arguments, both specious. First, it says that after the Intermediate Report here the Board's decision in Mountain Pacific came down, and then the General Counsel filed a brief with the Board in this case urging that the contract here was invalid under Mountain Pacific. The Board says that although the Union then urged that the Board could not properly consider that argument because the validity of the hiring hall provision had not been litigated, "it did not question the validity of the [Mountain Pacific] decision itself." Secondly, it says, respondents did not assert they had any evidence to adduce with respect to the Mountain Pacific issue
 Since the Board was without power to consider any such issue, it is hard to perceive why the Union was called upon to debate the Mountain Pacific case, or to offer evidence on a non-existent issue.